1
2
3
4
5
6
7
8
9
10
11
12
13
14

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

JOHN OLIVER SNOW,

                      Petitioner,

    v.

RENEE BAKER, *et al.*,

                  Respondents.

Case No. 2:03-cv-00292-MMD-CWH

ORDER

15

## I.    INTRODUCTION

16
17
18
19
20
21
22

    John Oliver Snow, a Nevada prisoner sentenced to death, initiated this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, by. The case is before the Court for resolution of the merits of the claims remaining in Snow's second amended petition for a writ of habeas corpus, and with respect to a motion for evidentiary hearing. The Court finds that an evidentiary hearing is not warranted, and denies Snow's motion for evidentiary hearing. The Court denies Snow's second amended habeas corpus petition. The Court grants Snow a certificate of appealability with respect to certain issues.

23

## II.    BACKGROUND FACTS AND PROCEDURAL HISTORY

24
25

    The following is the statement of facts and procedural history, as set forth by the Nevada Supreme Court in its 1985 opinion on Snow's direct appeal:

26
27
28

        As the hired assassin in the conspiracy to kill Harry Wham, Snow was paid several thousand dollars by the principal members of the conspiracy: Peggy Wham, Harry's wife, and her lover, Joseph Douglas Parker (Doug Parker). Also involved were Kathy Faltinowski, Peggy's

daughter and Harry's step daughter, and John David Parker (John Parker), Kathy's lover and the brother of Doug. [Footnote omitted.]

The conspiracy to kill Harry Wham began in the fall of 1982. Kathy Faltinowski testified that she overheard a conversation between Doug Parker and her mother in late November during which Peggy Wham said she wanted her husband killed. Sally Cook, Peggy's sister, testified that Doug Parker told her that he, John Parker and Peggy were going to have Harry Wham killed by hiring someone from back east. This conversation took place between Christmas and New Year's 1982. At that time, Snow shared an apartment at 801 Elizabeth, in Newark, New Jersey, with his common law wife, Ingrid Smith.

In early January 1983, Kathy Faltinowski drove with John and Doug Parker to Los Angeles and picked up John Biancone at the airport. Biancone also lived in New Jersey. Kathy overheard Doug ask Biancone to murder Harry Wham. Biancone agreed to commit the crime for $5,000 in advance and $5,000 after the murder was completed. Peggy Wham gave Kathy Faltinowski $5,000 to give to Doug. Peggy said she had stolen the money from the safe at the Keyboard Lounge which she owned with Harry Wham. Biancone then left Las Vegas. About one week before January 26, 1983, Kathy Faltinowski saw Biancone who is white, with Snow, who is black, in Las Vegas.

On January 26, 1983, Harry Wham was shot in what appeared to be a robbery. Harry told police that he parked his pick up on the street near his town house around 11:00 p.m. A black man got out of the passenger side of a nearby car and demanded that Harry get out of his truck, hand over his money, and turn around. Harry thought he saw a white male on the driver's side. The black man then shot Harry in the neck. Harry was injured but spent only twenty four hours in the hospital. Harry remarked at the time that he did not believe it was a genuine robbery. After the shooting, Doug Parker told Kathy Faltinowski and John Parker that Biancone drove the car the night of January 26 and that Snow shot Harry Wham in the back of the head.

Between January 26 and February 13, 1983, John Parker and Doug Parker told Kathy Faltinowski that Snow and Biancone [footnote omitted] were going to come back and finish the job. During this same period, Sally Cook heard John and Doug talking about how "the man" was impatient and wanted to finish the job. John then said he would call the man and took out a slip of paper that had the words "John Snow" and "New Jersey" written on it, as well as an address or a phone number.

A few days before February 13, 1983, Peggy Wham gave John Parker the key to the Wham garage. When Kathy Faltinowski was present, John and Peggy cleaned out the garage and arranged boxes at the side to form a hiding place. Arlen Edwards, Harry Wham's next door neighbor, testified about the existence of the hiding place immediately after Harry Wham was murdered in the garage.

At 1:30 p.m. on February 13, 1983, Kathy Faltinowski and John Parker drove to the Golden City Motel to pick up Snow. He came out of Room 106. Snow was wearing a dark pinstripe suit. He had a revolver with a silencer on it. The three drove to Peggy and Harry Wham's town house on Pecos Way in Las Vegas. John unlocked the Whams' garage door

using the key given him by Peggy. Snow put on rubber gloves and hid behind the boxes. John and Kathy Faltinowski left the Whams around 2:00 p.m.

Arlen and Jody Edwards lived in the town house next door to the Whams. At 4:20 p.m. on February 13, 1983, Arlen and Jody walked out of their house and into their garage. They both heard "popping" noises and then saw a black man in a dark suit run from the Wham garage. Arlen saw only part of the man's face and could not identify Snow as that man. Arlen chased the man and lost sight of him as he ran across a desert area toward the Wagon Wheel Apartments on Pecos Road. Kathy Faltinowski lived in the Wagon Wheel Apartments about four blocks from the Wham town house.

At Snow's trial, Jody Edwards testified that she saw all of the black man's face as he paused just outside the Whams' garage. She identified Snow as that man in court. Jody admitted that she testified at the previous trial of Peggy Wham that she could not identify the man who ran from the garage. Jody testified that she had lied before because she had been threatened by Peggy and by Kathy Faltinowski.

Immediately after the shooting on February 13, 1983, Arlen Edwards found Harry Wham sitting in his car bleeding heavily. Harry died before the paramedics arrived. His death was due to multiple gunshot wounds in the face and head.

Around 4:30 p.m., on February 13, 1983, John Parker and Kathy Faltinowski were driving down Pecos Road. They saw Snow running towards Kathy's apartment. They returned to the apartment joining Sally Cook who was also there. Sally testified that a few minutes later a black man in a dark suit burst in demanding a ride. John asked Sally to give the black man, whom he called John Snow, a ride. Sally refused. Kathy Faltinowski drove Snow back to the Golden City Motel. During the drive, Snow told Kathy that he had just shot her stepfather.

On February 16, 1983, Sally Cook spoke with a friend about the Wham murder. The friend, Richard Hansen, advised her to go to the police but Sally would not. Hansen reported this to the police. Hansen agreed to wear a microphone and transmitting device when he next spoke with Sally. The police taped a subsequent conversation between him and Sally. As a result of this conversation, the police arrested Peggy Wham, Kathy Faltinowski, John and Doug Parker on the afternoon on February 17, 1983.

In the morning of February 17, 1983, Doug Parker told Sally Cook that he had just given the hit man $7,000 and that the hit man was on his way to San Francisco. Snow himself testified that he flew from Las Vegas to San Francisco on that date. From a pay phone at the San Francisco airport, a call was made just after twelve noon that day to the home of the parents of the Parker brothers. The call was charged to the telephone at 801 Elizabeth, Snow's apartment in Newark, New Jersey. The mother of Doug and John Parker testified that she answered the telephone in her home in the early afternoon of February 17, 1983. The caller left a message asking Doug to get in touch with Johnny. Another call shortly after the first was placed from the same pay phone at the San Francisco airport and was charged to the same number in New Jersey. This call was

made to a friend of Snow's, Olivia Burnett, living in Fairfield, California. Burnett testified that Snow called her that day to come pick him up at the airport.

Police investigators obtained additional information from Sally Cook which led to Snow being indicted for Harry Wham's murder. A warrant for Snow's arrest was issued and programmed into the National Crime Information computer. On March 4, 1983, Snow was arraigned in Superior Court in New Jersey on unrelated charges. He was fingerprinted. Snow's fingerprints called up the Nevada arrest warrant from the computer. As a result, Snow was arrested and booked for the murder of Harry Wham.

Snow denied knowing either Doug or John Parker. In his wallet when Snow was arrested was a piece of paper with "Doug" on it and the telephone number of the home of the Parkers' parents. Snow also told police that the last time he had been in Las Vegas was in 1966 or 1967. At trial, evidence was introduced that Snow's fingerprint had been found in Room 106 at the Golden City Motel on February 17, 1983. Witnesses from the motel identified Snow as the man who stayed in Room 106 for several days in February 1983.

Snow was charged with conspiracy to commit murder, first degree murder with use of a deadly weapon and attempted murder. He was convicted of conspiracy to commit murder and first degree murder with use of a deadly weapon. At the penalty hearing on the first degree murder conviction, the State produced evidence that Snow pleaded guilty in 1962 to robbing three victims in separate incidents. Following the penalty hearing, the jury returned a verdict finding three aggravating circumstances: that the murder was committed by a person previously convicted of a crime involving the use or threat of violence; that the murder was committed during the commission or attempt of a burglary; that the murder was committed for the purpose of receiving money or other things of monetary value. The jury found no mitigating circumstances and sentenced Snow to death.

*Snow v. State*, 101 Nev. 439, 441-44, 705 P.2d 632, 634-37 (1985). The Nevada

Supreme Court affirmed Snow's conviction and sentence on August 28, 1985. *Snow*,

101 Nev. at 449, 705 P.2d at 639. The United States Supreme Court denied certiorari

on February 24, 1986. *Snow v. Nevada*, 475 U.S. 1031 (1986).

Snow filed his first state habeas corpus petition on February 24, 1989.

Respondents' Exh. 4.[1] The state district court conducted an evidentiary hearing on

September 15, 1986. Petitioner's Exh. 29. The state district court denied the petition on

_____

[1]The exhibits identified in this order as "Respondents' Exhibits" were filed by respondents and are found in the record at dkt. nos. 147 and 200. The exhibits identified in this order as "Petitioner's Exhibits" were filed by Snow and are found in the record at dkt. nos. 115, 116, 138 and 158.

November 19, 1986. Respondents' Exh. 5. Snow appealed. Respondents' Exhs. 6a, 6b. On August 27, 1987, the Nevada Supreme Court affirmed the denial of the petition, and ordered the appeal dismissed. Respondents' Exh. 7. In ruling on that appeal, the Nevada Supreme Court observed:

> The evidence marshalled against Snow is overwhelming. Eyewitnesses identified him, coconspirators and others testified against him, and considerable circumstantial evidence pointed directly to him, including fingerprints, phone calls, and receipt of money for the job.

Order Dismissing Appeal, Respondents' Exh. 7 at 2. The United States Supreme Court denied Snow's petition for certiorari on November 30, 1987. *Snow v. Sumner*, 484 U.S. 970 (1987).

On November 12, 1987, Snow filed, in the state district court, a motion for a new trial based on his alleged discovery of new evidence. The state district court denied the motion on procedural grounds on November 17, 1987, and the Nevada Supreme Court affirmed on September 6, 1989. Respondents' Exh. 8; *Snow v. State*, 105 Nev. 521, 779 P.2d 96 (1989).

On December 22, 1987, Snow filed his first federal habeas corpus action, which was case number CV-N-87-87-0615-ECR. Snow voluntarily dismissed that action on August 3, 1988.

On December 28, 1989, Snow filed his second state habeas petition. Respondents' Exh. 9. The state district court conducted an evidentiary hearing, and then denied the petition on December 8, 1992. Respondents' Exh. 10. The Nevada Supreme Court dismissed Snow's appeal from that ruling on March 19, 1993. Respondents' Exh. 11.

On March 21, 1994, Snow initiated his second federal habeas corpus action, case number CV-S-94-0278-PMP-LRL. That action was dismissed on March 20, 1997. *See* Petitioner's Exhs. 233, 234.

On April 16, 1997, Snow filed his third state habeas corpus petition. Respondents' Exh. 12. The state district court denied that petition, ruling that it was

1   procedurally barred, on March 25, 2002. Respondents' Exh. 17. The Nevada Supreme

2   Court affirmed that ruling on December 10, 2002. Respondents' Exh. 19.

3       On October 22, 1997, Snow filed, in the state district court, a supplemental

4   motion for a new trial, based on alleged juror misconduct, and that motion was denied

5   by the state district court on December 31, 1997. *See* Respondents' Exh. 17 at 4.

6       On March 13, 2003, Snow initiated this, his third, federal habeas corpus action.

7   Counsel was appointed (dkt. nos. 4, 9, 12, 14, 18, 19). Snow conducted discovery, and

8   then, on November 26, 2007, filed a first amended habeas petition (dkt. no. 115). On

9   April 14, 2008, pursuant to a stipulation of the parties, this action was stayed to allow

10  Snow to return to state court to further exhaust claims (dkt. nos. 121, 122).

11      On April 25, 2008, Snow initiated his fourth state habeas action. Respondents'

12  Exhs. 20a, 20b. That petition was dismissed on April 23, 2009. Respondents' Exh. 22.

13  Snow appealed. Respondents' Exh. 23. On July 27, 2011, the Nevada Supreme Court

14  affirmed. Respondents' Exh. 24.

15      On January 4, 2012, the stay of this action was lifted (dkt. no. 134), and Snow

16  filed a second amended habeas petition on March 9, 2012 (dkt. no. 137).

17      On August 31, 2012, respondents filed a motion to dismiss (dkt. no. 146). On

18  September 12, 2013, the Court granted that motion in part and denied it in part (dkt. no.

19  173), dismissing the following claims: Claims 1A, 1B, 1C, 1D, 1E, 2, 5, 6, 7, 8, 9, 10A,

20  10B, 10C, 10E, 10F, 10G, 10H, 10I, 10J, 10K (except to the extent Snow claims that his

21  trial counsel was ineffective for failing to present evidence that Snow had once saved

22  the life of a prison guard, and evidence that in the past two physicians had stated their

23  opinion that Snow was legally insane), 10L, 10M, 10N (except to the extent that Snow

24  claims that his trial counsel was ineffective for failing to raise the claim in Claim 8 that

25  the prosecutor improperly injected his own opinion into his closing argument in the

26  penalty phase of the trial), 12A, 12B, 13A, 13B, 13C, 15, 16 (except to the extent that

27  Snow claims that his appellate counsel was ineffective on his direct appeal for failing to

28  raise Claim 3, and for failing to raise the claim in Claim 8 that the prosecutor improperly

injected his own opinion into his closing argument in the penalty phase of the trial), 17, 18, 20, and 21. Snow filed a motion for reconsideration (dkt. no. 174), and the Court denied that motion on November 5, 2013 (dkt. no. 177).

The resolution of the motion to dismiss left the following claims in Snow's second amended habeas petition to be resolved on their merits: Claims 3, 4, 10D, 10K (to the extent Snow claims that his trial counsel was ineffective for failing to present evidence that Snow had once saved the life of a prison guard, and evidence that, in the past, two physicians had stated their opinion that Snow was legally insane), 10N (to the extent that Snow claims that his trial counsel was ineffective for failing to raise the claim in Claim 8 that the prosecutor improperly injected his own opinion into his closing argument in the penalty phase of the trial), 11, 14, 16 (to the extent that Snow claims that his appellate counsel was ineffective on his direct appeal for failing to raise Claim 3, and for failing to raise the claim in Claim 8 that the prosecutor improperly injected his own opinion into his closing argument in the penalty phase of the trial), and 19. On February 27, 2014, respondents filed an answer, responding to those claims (dkt. no. 183). Snow filed a reply on August 19, 2014 (dkt. no. 193). Respondents filed a response to the reply on September 17, 2014 (dkt. no. 194).

On July 15, 2014, Snow filed a motion for evidentiary hearing (dkt. no. 187). Respondents filed an opposition to that motion on September 17, 2014 (dkt. no. 195). Snow filed a reply in support of his motion for evidentiary hearing on November 7, 2014 (dkt. no. 198).

On September 8, 2015, the Court issued an order (dkt. no. 199), pursuant to Rule 5(c) of the Rules Governing Section 2254 Cases in the United States District Courts, requiring the respondents to file, as exhibits, copies of the transcripts of the entire jury selection proceedings in Snow's trial. Respondents complied with that order, and filed the supplemental exhibits as directed, on September 16, 2015 (dkt. no. 200).

The case is now before the Court with respect to Snow's motion for evidentiary hearing, and with respect to the merits of his remaining claims.

**III.    STANDARD OF REVIEW**

28 U.S.C. § 2254(d) sets forth the primary standard of review applicable in this case under the Antiterrorism and Effective Death Penalty Act (AEDPA):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## IV.   ANALYSIS

### A.   Claim 3

In Claim 3 of his second amended petition, Snow claims that his federal constitutional rights were violated "because his death sentence is disproportionate to that of his co-defendants, being the product of racial discrimination by state officials." Second Amended Petition (dkt. no. 137) at 45.

On Snow's direct appeal, the Nevada Supreme Court ruled as follows in conducting an automatic proportionality review regarding Snow's death sentence:

> Under NRS 177.055(2)(d), this Court must review a death sentence and determine whether it is disproportionate to the penalty imposed in similar cases in this state. [Footnote: NRS 177.055(2)(d) was recently amended to abolish the proportionality review requirement. This amendment became effective June 6, 1985. 1985 Stats. ch. 527 § 1, at 1597-1598. The prohibition against ex post facto laws requires that we apply the law as it existed when the crime was committed. *See Goldsworthy v. Hannifin*, 86 Nev. 252, 468 P.2d 350 (1970). Therefore, we must conduct a proportionality review of appellant's sentence.] We conclude, after analyzing the circumstances of Snow's crime, that the sentence of death is not disproportionate to the penalty imposed in similar cases. *See Nevius v. State*, 101 Nev. 238, 699 P.2d 1053 (1985); *Petrocelli v. State*, 101 Nev. 46, 692 P.2d 503 (1985); *Deutscher v. State*, 95 Nev. 669, 601 P.2d 407 (1979).

*Snow*, 101 Nev. at 448, 705 P.2d at 639. Subsequently, on Snow's appeal in his state habeas action, the Nevada Supreme Court commented, as follows, on its ruling on the proportionality review of Snow's sentence, clarifying that the ruling included a comparison of Snow's sentence with the sentences received by his co-defendants:

Snow contends that the habeas court erred in finding that Joseph Houston [Snow's trial counsel] was not ineffective for failing to argue on direct appeal that Snow's death sentence was disproportionate to the sentences given to the other members of the conspiracy. We disagree. At that time, NRS 177.055(2) required this court to review whether the sentence was proportionate to penalties imposed in other cases. We concluded that the sentence of death was not disproportionate and that it had not been imposed under passion, prejudice, or any arbitrary factor. *Snow*, 101 Nev. At 448-49. The habeas court correctly held that we were aware of the sentences received by the co-defendants when we conducted our proportionality review. Snow's sentence was not disproportionate to the other defendants. Although the other conspirators were equally culpable, Snow was the hired trigger man, with a lengthy criminal and prison record. None of the other defendants had similar criminal records. We have upheld disparate death sentences in other cases. *See Neuschafer v. State*, 101 Nev. 331, 337, 705 P.2d 609, 613 (1985) (death sentence not disproportionate to other defendants who received life with or life without parole). Therefore, we hold that Houston did not render ineffective assistance for failing to raise the issue on appeal.

Order Dismissing Appeal, Respondents' Exh. 7 at 2-3.

The Supreme Court has never recognized a federal constitutional right, on the part of a defendant in a capital murder case, to a sentence proportionate to the sentences received by his co-defendants. On the contrary, the Supreme Court has held that, absent a showing that a system operated in an arbitrary and capricious manner, a petitioner "cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987) (emphasis in original); *see also Pulley v. Harris*, 465 U.S. 37, 50-51 (1984) ("There is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."); *Beardslee v. Woodford*, 358 F.3d 560, 579-80 (9th Cir.2004) (rejecting argument that "different sentences for equally culpable co-defendants violate the prohibition against arbitrary imposition of the death penalty"); *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir.1996) ("There is no federal right to proportionality review...."); *Martinez–Villareal v. Lewis*, 80 F.3d 1301, 1308 (9th Cir.1996) (same).

///

Furthermore, even if comparative proportionality among the sentences received by Snow and his co-defendants was a federal constitutional requirement, the Nevada Supreme Court reasonably determined that Snow's more severe sentence was justified because his part in the murder was significantly different from the roles of his co-defendants. Snow's co-defendants evidently conspired to have Harry Wham killed, and took steps to advance the conspiracy; however, none of Snow's co-defendants, themselves, shot and killed Harry Wham. On the other hand, given the prosecution's theory of its case against Snow, and the jury's verdict, it is apparent that the jury concluded that Snow traveled across the country to kill Harry Wham, hid in Harry Wham's garage, shot and killed Harry Wham when he arrived there, and was paid for doing so. Furthermore, while Snow argues that, like him, his co-defendants had criminal records (*see* Reply (dkt. no. 193) at 14), their records did not compare to Snow's.[2]

Turning to Snow's contention that his death sentence was the result of racial discrimination, Snow makes no allegation, and proffers no evidence, showing purposeful racial discrimination against him.

Prosecutors may not selectively enforce criminal statutes based on race, religion, national origin, or any other arbitrary classification. *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). The law, however, presumes, in the absence of "exceptionally clear proof," that the prosecutor has not abused his or her wide discretion — discretion that is "essential to the criminal justice process." *McCleskey v. Kemp*, 481 U.S. 279, 297 (1987). And, it is not sufficient to prove discriminatory effect alone; rather, the petitioner must prove that there was a discriminatory purpose, that is, that the prosecution has taken action "because of, not merely in spite of, its adverse effects upon an identifiable group." *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (citation and internal quotations omitted).

---

[2]Snow evidently had six prior felony convictions, three of them for armed robbery, as well as additional arrests for assault with a deadly weapon and ex-felon in possession of a deadly weapon, and he had spent considerable time in prison. On the other hand, one of the Parker brothers had no prior convictions and the other had two prior misdemeanor convictions. *See* Response to Reply (dkt. no. 194) at 19.

In arguing that his death sentence was the result of racial discrimination, Snow marshals statistics regarding Nevada's death row. *See* Second Amended Petition, at 45-46. Snow asserts that Nevada has a history of racism. *See id.* at 46. Snow points out that the judge, prosecutors, defense counsel, jurors (except for one alternate juror), co-defendants, and victim were all white, and he is black. *See id.* at 45-46, 54-55. Snow proffers evidence that his trial counsel believed that the Clark County District Attorney exhibited racial discrimination in other capital cases in which he represented defendants. *See id.* at 49. Snow points to racist comments made by his co-defendants. *See id.* at 54-55, 57. Snow points to a statement made by his own counsel, in his penalty-phase closing argument, which included a racially derogatory term. *See id.* at 58. However, none of this supports Snow's claim that the prosecution sought and obtained the death penalty against him, but not against his co-defendants, out of purposeful racial discrimination.

Snow argues that the lead detective in the investigation, Detective Thomas Dillard, repeatedly used a racial epithet ("Nigger John") to refer to him in a police report (Petitioner's Exh. 164), and in taking a statement from John Parker (Petitioner's Exh. 77). Second Amended Petition, at 55-56. It is plain from a reading of those materials, however, that Detective Dillard used the racial epithet because that was an alias by which Snow's co-defendants referred to him. Detective Dillard's use of the racial epithet in the police report and in his questioning of John Parker did not indicate racial discrimination against Snow on his part. Detective Dillard's use of the racial epithet in those contexts does not indicate that Snow's death sentence resulted from purposeful racial discrimination.

Snow also points to the following testimony by Detective Dillard, during his testimony on cross-examination, contending that it indicates racial discrimination:

> Q. (By Mr. Houston [defense counsel]) In your mind, did the description given by Mr. Edwards that the man was a light-complected black man match the descriptions given by Sally Cook that he was a very dark man, and the description given by Kathy Faltinowski that he was a dark black man?

A.      Yes. I justified that by assuming the amount of perspiration from the foot travel from the scene of the shooting to the Apartment 140.

Q.      How did the foot travel — the fact that he ran from one place to another change his complexion?

A.      Perspiration.

Reporter's Transcript of Proceedings, April 10, 1984, Respondents' Exh. 1(i), at 1020; *see* Second Amended Petition, at 56-58. This testimony by Detective Dillard — whether or not Snow believes it to be credible — does not show racial discrimination on Detective Dillard's part, and does not support Snow's claim that his death sentence was the result of purposeful racial discrimination.

Snow requests an evidentiary hearing with respect to Claim 3. *See* Motion for Evidentiary Hearing (dkt. no. 187), at 3. However, Snow does not state what factual issue he would address at an evidentiary hearing regarding this claim, and he does not state what evidence he would seek to introduce at such an evidentiary hearing. In resolving Claim 3, the Court assumes the truth of Snow's specific factual allegations, and determines that the claim fails. An evidentiary hearing is unwarranted.

The state court's denial of the claim asserted by Snow as Claim 3 of his second amended habeas petition in this case was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and the state court's ruling was not based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). Snow does not show habeas corpus relief to be warranted. The Court will deny habeas corpus relief with respect to Claim 3.

**B.   Claim 4**

In Claim 4, Snow claims that his federal constitutional rights were violated "due to the seating of jurors on Mr. Snow's jury who were not impartial." Second Amended Petition, at 62. His claim concerns jurors Lorraine Van Compernolle and Dorothy Hansen. *Id.* at 62-69.

///

Snow raised this claim before the Nevada Supreme Court on his direct appeal. *See* Appellant's Opening Brief, Respondents' Exh. 3 at 40-49; Appellant's Reply Brief, Petitioner's Exh. 210 at 21-26. In that briefing, Snow stated that his claim was made, in part, under the United States Constitution. *See* Appellant's Opening Brief, Respondents' Exh. 3 at 40 ("The Nevada and United States Constitutions both provide for the right to a jury trial and the right to due process of law at said trial."); Appellant's Reply Brief, Petitioner's Exh. 210 at 26 ("[T]he Defendant was obviously denied ... the protection of the United States Constitution due process of law. . . ."). The Nevada Supreme Court ruled as follows, focusing on the state-law aspects of the claim:

> Next, Snow contends that two jurors, Lorraine Van Compernolle and Dorothy Hansen, should have been excluded for cause under NRS 16.050(1)(f). [Footnote:  NRS 16.050(1) provides: "Challenges for cause may be taken on one or more of the following grounds: . . . (f) Having formed or expressed an unqualified opinion or belief as to the merits of the action, or the main question involved therein; but the reading of newspaper accounts of the subject matter before the court shall not disqualify a juror either for bias or opinion."] That statute provides that a juror may be challenged for cause if he or she has "formed or expressed unqualified opinion as to the merits of the action." Both juror Van Compernolle and juror Hansen indicated that they had previously formed an opinion on appellant's guilt from their exposure to news media accounts of the crime. Neither juror represented that their opinion was "unqualified." Instead, both stated that they would set aside their previous opinions and would be able to keep an open mind as to appellant's guilt until a verdict was reached. Therefore, the district court did not err in refusing to exclude these two jurors. *Kaplan v. State*, 96 Nev. 798, 800, 618 P.2d 354, 355-56 (1980).

*Snow*, 101 Nev. at 445-46, 705 P.2d at 637-38.

"In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial . . . by an impartial jury." U.S. Const., Amends. 6 and 14. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Nevertheless, jurors need not "be totally ignorant of the facts and issues involved." *Id.* The question "is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035 (1984).

Reviewing courts are to give deference to the trial court's assessment of the impartiality of potential jurors. The Supreme Court has stated this principle as follows:

> Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record — among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. *See* [*Reynolds v. United States*, 98 U.S. 145, 156-57 (1879)]. In contrast to the cold transcript received by the appellate court, the in-the-moment *voir dire* affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service.

*Skilling v. United States*, 561 U.S. 358, 386-87 (2010); *see also Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) ("The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. . . .").

The Nevada Supreme Court's denial of the claim asserted by Snow in Claim 4 was not unreasonable.

The following is the pertinent exchange that occurred in voir dire regarding Juror Van Compernolle:

[BY THE TRIAL JUDGE:]

Q.    Mrs. Van Compernolle, have you heard of this case prior to coming to court today?

A.    Yes, sir.

Q.    Can you tell me how you heard [of] it?

A.    I saw the news reports and read it in the newspaper.

Q.    When did this occur, the reporting?

A.    Oh, well, about two months ago, I guess, is when it happened, when it first came out, the news reports.

Q.    What medium did you see it first reported, the television, radio, newspaper or what?

A.    I can't tell you. I saw both at different times. I can't tell you when I first saw it.

Q.    Do you recall what you thought about the situation when you first heard of it?  Did you form an opinion as to the guilt or innocence of the defendant by virtue of hearing the report?

1      A.      I guess I did but isn't that normal?

2      Q.      It may well be. What I am asking is in your opinion at the
3  time, were you convinced at the time of the gentleman's guilt or just
   another report of another offense or you are not sure or just exactly what
4  was your attitude?

5      A.      Well, I really thought he did it.

6      Q.      Do you recall the specifics of what you heard reported?

7      A.      Well, they were telling the story about what happened and
   the officers that were there and how the man came in. I mean, am I
8  supposed to say?

9      Q.      Yes.

10     A.      How they were hired to do the job from New York and all this
   type of thing.

11     Q.      Who was hired, do you know?

12     A.      The person that killed Harry Wham.

13     Q.      Do you remember the name?

14     A.      No, sir, I don't.

15     Q.      Do you remember who hired him or she?

16     A.      Well, they were talking about Peggy Wham and I would say
17 Peggy Wham.

18     Q.      Do you think that by virtue of your having heard about this
   case previously that your mind is in such condition that you cannot be
19 objective in hearing the evidence from the stand and basing your sole
   opinion solely on that evidence?

20     A.      No, sir. I don't because I think everybody read the same
21 thing or heard the same thing.

22     Q.      Well, perhaps I didn't understand your response but do you
   think that you can be objective or cannot?

23     A.      I can be objective.

24     Q,      Do you understand that your duty as a juror, if you were
25 selected, is to weigh the evidence that you hear from the stand and base
   your determination of guilt on that and solely upon that. Do you
26 understand?

27     A.      Yes.

28     Q.      Do you think you can do that?

1    A.    Yes.

2    Q.    Would you agree with that, that the newspapers, television,
3 radio or whatever medium in reporting something of this nature, does not
always represent the facts or the true facts of the situation?

4    A.    Yes. I agree with you.

5                              *    *    *

6    Q.    Did you know Harry Wham or any of the principals in this
7 case as far as you know at this point?

8    A.    No, sir. Years ago when my son was very young he took
lessons from Harry Wham but I didn't know him.

9    Q.    What sort of lessons?

10   A.    Diving lessons.

11   Q.    How long ago was that?

12   A.    Well, my son's now 26 and I guess he was probably about
13 11 or 12.

14   Q.    Did you meet Harry Wham during that time?

15   A.    No, sir.

16   Q.    Have you been at the Keyboard Lounge?

17   A.    No, sir.

18   Q.    Do you have any particular prejudice as to the nature of the
charge in this case?

19   A.    No, sir.

20   Q.    Do you know any of the other prospective jurors, persons
21 that have been in court this morning?

22   A.    No, sir.

23   Q.    Do you have any racial prejudice?

24   A.    No sir.

25   Q.    Do you understand that an indictment is a mere accusation
and not evidence?

26   A.    Yes, sir.

27   Q.    And that the defendant is presumed to be innocent until
28 proven guilty?

1    A.    Yes, sir.

2    Q.    And that the State has the burden of proving the defendant's
3  guilt beyond a reasonable doubt?

4    A.    Yes.

5    Q.    If you were charged with a similar offense, would you want
   12 individuals on your jury that are essentially in the same state of mind
6  that you are in at this time?

7    A.    Yes, sir, I would.

8    Q.    Do you know of any reason at all why you cannot be
   completely fair and completely impartial in hearing this case?

9    A.    No, sir.

10                           *    *    *

11   BY MR. HOUSTON:

12   Q.    Mrs. Van Compernolle, you indicated that at the time you
   heard about this case on television and newspapers, that at least at that
13 time when you heard about it, you did form an opinion in that you stated
   here under oath that you believe that the person had actually done the
14 shooting, correct?

15   A.    Yes, sir.

16   Q.    The one that they thought had done it had actually done it, in
17 other words, correct?

   A.    Yes, sir.
18
   Q.    And you understand that the person they thought that did it
19 is this person who is here in the courtroom now, obviously, correct?

20   A.    Obviously.

21   Q.    And I assume that you and your husband may have just
22 discussed this case casually?

   A.    Yes, sir.
23
                           *    *    *
24
   Q.    In talking about it, you just discussed the case in general and
25 what was on the news?

26   A.    Yes, sir.

27   Q.    Was it also his opinion that this person had done it?

28   A.    Yes, sir.

                           18

1

2

     Q.    Now, you indicated that you also felt that even though you have made that decision at an earlier time, perhaps even months ago, you think you could be fair you testified to here, correct, today?

3

4

     A.    If it's proven — if I listen to the case and I feel that he is not guilty, then I would vote that he is not guilty.

                *   *   *

5

6

     Q.    Well, Miss Van Compernolle, the fact is you indicated that you felt other people would have this same problem, correct?

7

     A.    I did say that, yes.

8

9

     Q.    But the fact is that you have in the past, at least based upon what you knew at that time, made a conscious decision obviously that you believe this man to be guilty in the past?

10

     A.    Yes, sir.

11

     Q.    Now, obviously you haven't heard the evidence, no one has?

12

     A.    No.

13

14

15

     Q.    And I know you are going to try to be fair but don't you believe the fact that you have made up a decision in the past based upon what you were told on the news media, don't you think there is a possibility that that might [affect] the way you view the witnesses and hear the evidence in this case, if you are being truthful?

16

17

     A.    It's hard to answer. See, there was a murder and because he's the defendant, you know, I don't know that it's him, you know.

18

     Nobody knows, okay, but Harry Wham is dead and someone did kill him and what can I say?

19

20

     Q.    So it may be possible that it is going to [affect] your verdict, being truthful, isn't that a possibility?

21

     A.    Well, it may but if I kept an open mind, it may not. I mean —

22

     Q.    So you would have to try to keep an open mind?

23

     A.    Yes, sir.

                *   *   *

24

BY MR. TEUTON [prosecutor]:

25

     Q.    Mrs. Van Compernolle, have you in the past read accounts of other alleged crimes in the newspapers when they occur?

26

27

     A.    Yes, sir.

28

1  Q.      And have you based on having read those accounts formed
2  an opinion at the time that you read it as to the guilt or innocence of
   whoever was being accused?

3  A.      I can't think of any specific one, no.

4  Q.      I'm sorry.

5  A.      I can't think of any specific case that I have, no.

6  Q.      Have you formed the opinion that John Oliver Snow is guilty
7  of the murder of Harry Wham?

8  A.      No, sir.

   Q.      You formed an opinion that Harry Wham was murdered?
9
   A.      Yes, sir.
10
   Q.      Did you at the time that you read the newspaper accounts or
11 saw it on T.V. or whenever form an opinion as to the identity of the people
   that may have been involved and those people's guilt or innocence?
12
   A.      Probably, because in the way they were described in the
13 newspaper as being hired men, yes.

14 Q.      As being hired?

15 A.      Uh-huh.

16 Q.      Do you at this time recall the specific details that led you to
17 believe as you did months ago when you were aware of that information?

   A.      Yes.
18
   Q.      Would you form your opinion at the conclusion of this trial
19 based upon your recollection of those accounts or would you form your
   opinion based on evidence that was presented either by Mr. Harmon and
20 myself or Mr. Houston in this case?

21 A.      I would base it on the evidence in the courtroom.

22 Q.      Just what you hear?

23 A.      Yes.

24 Q.      Would you have any problem distinguishing between what
25 you think you recall and the evidence that is presented?

   A.      I hope not.
26
   Q.      Have you read anything in the newspapers in the past which
27 you subsequently, after learning more evidence, found out to be untrue?

28 A.      Yes, sir.

1   Q.      Did you have any problem reconciling the fact that you had
2   thought something to be true because you read it with the fact that upon
    being presented evidence you no longer believed the initial account in the
3   paper?

4   A.      No, sir.

5                                    *    *    *

6   THE COURT:      All right. It's the Court's opinion that the
    prospective [juror] has not expressed an unqualified opinion or belief to
7   the merits of the case and she can be objective.

    The motion to excuse for cause is denied.
8

9   Transcript of Voir Dire Examination of Jurors, Respondents' Exh. 26 at 26-36.

10      And, the following is the pertinent exchange that occurred in voir dire regarding

11  Juror Dorothy Hansen:

12  [BY THE TRIAL JUDGE:]

13  Q.      Okay. A person who is accused of committing a crime is
    presumed to be innocent in a criminal trial?
14
15  A.      Correct.

16  Q.      Do you understand that?

17  A.      Yes.

18  Q.      Do you agree with it?

19  A.      Yes.

20  Q.      Are you aware that the defendant does not have to take the
    stand and testify or offer any evidence if he chooses not to and you could
21  still find him not guilty, the reason being, that the State has the burden of
    proving the defendant's guilt beyond a reasonable doubt? Do you
22  understand that?

23  A.      Yes.

24  Q.      Do you agree with that concept?

25  A.      Yes.

                                     *    *    *
26

27  Q.      Do you know of any reason at this point why you could not
    serve as a fair juror in this particular case?
28
    A.      No. I could.

                                     21

Q.      Mrs. Hansen, had you heard about this case before coming to court yesterday?

A.      Yes, I have.

Q.      Can you tell us how you heard of it?

A.      On the T.V., in the newspaper.

Q.      How long ago?

A.      Well, when it all happened. I can't remember now how long ago. Was it a year, two years or whatever it was.

Q.      So you are thinking a year or so ago?

A.      Right.

Q.      Have you heard since about the case?

A.      No, I haven't.

Q.      Do you recall the names that you heard reported?

A.      Well, you mentioned them yesterday, also.

Q.      You heard of the Wham name?

A.      Yes, correct.

Q.      And others that you can think of?

A.      And the gentleman here, Mr. Snow.

Q.      Did you hear the Snow name reported?

A.      Correct.

Q.      Do you recall at the time that you heard about the account through the media, did you form an opinion one way or the other as to the guilt or innocence of the parties?

A.      Well, I don't know enough about it to form an opinion but —

Q.      At the time, do you recall what you may have thought when you read about it or heard about it?

A.      Well, the way they presented it to you, there was a guilty one and they had gone after the young man and that they were accusing him of it.

Q.      Do you recall, though, in your mind did you form an opinion at the time you heard about the account as to who was responsible?

A.     Well, I guess I would have to say yes the way it was presented to me, right.

Q.     At this time, do you feel that you have an opinion as to who was guilty or who wasn't or do you think you can be objective and hear the evidence as it comes forth?

A.     In the jury room I would say I have an open mind to it.

Q.     Do you understand that the defendant does not have a burden of proving his innocence; rather, the State has the burden of proving the defendant's guilt. Do you understand that?

A.     Yes.

Q.     Your job as a juror, Mrs. Hansen, would be to hear the evidence from the stand and determine in your mind whether or not the defendant is guilty. You are to discount anything you would hear outside the courtroom or have heard in the past. Do you understand that?

A.     Right.  I understand that.

Q.     Do you think you could do that?

A.     I certainly will try to do that, right.

Q.     Well, in your opinion, do you think you would accomplish that goal? Do you think you could do that?

A.     Yes.

                              *     *     *

Q.     Did you know Harry Wham at all?

A.     No, I did not.

Q.     Are you familiar with the Keyboard Lounge?

A.     From the media, yes. I never knew about it before that.

Q.     Do you know where it is?

A.     Yes. I do know where it is.

Q.     Have you ever been in it?

A.     No.

                              *     *     *

Q.     Do you have any prejudice as to the nature of the charges in this case?

A.     No.

Q.     Do you know any of the other prospective jurors?

A.     No. I don't know them other than just meeting them yesterday and today.

Q.     Do you have any racial prejudice?

A.     I do not have any racial prejudice.

Q.     Do you understand that an indictment is a mere accusation and not evidence? An indictment is a piece of paper essentially that has the charges written on it? Do you understand that in itself is not evidence. It is a mere accusation. Do you understand that?

A.     Right.

Q.     Do you understand that the defendant is presumed to be innocent until proven guilty?

A.     Correct.

Q.     And that the State has the burden of proving the defendant's guilt beyond a reasonable doubt?

A.     Right.

Q.     If you were charged with offenses such as these, Mrs. Hansen, would you want 12 individuals such as yourself to be on your jury?

A.     Correct, yes.

Q.     Can you think of any reason at all why you cannot be completely fair and completely impartial in hearing this case?

A.     No. I believe I could be a good juror.

*     *     *

[BY MR. HOUSTON:]

Q.     Now, a little prior to that, the Judge had asked you — well, first of all, you stated that after you read — did you read this in the newspaper and see it on T.V.?

A.     Correct, both ways.

Q.     That after hearing the accounts of it, you based upon those accounts at the time, which obviously you recalled quite a few details and even names being given, you said at that time based upon what you heard, you formed an opinion that the man they believed had committed the crime, being this man Mr. Snow, had actually committed the crime based upon that evidence; correct?

A.     Correct, right.

24

Q.      And you indicated to the Judge, even though that was true you felt you would try to be fair here and try to — I believe your words were — set that aside and render a decision based upon the evidence, correct?

A.      Right. Well, I believe that that's your position is to present the case to me or the jurors to make —

Q.      For me to present the evidence to you to show that he isn't guilty?

A.      Correct.

Q.      But irrespective of that and like I understand you have not heard the case now and I am not asking for you to judge in the future. I just want to go back to the time that you heard the reports.

At that time, did you talk to your husband about the case at all?

A.      I would have to say we probably did, right.

Q.      You probably just not in real specifics but just based what you heard on the news reports, you and him talked about what was in the reports?

A.      Yeah, but I don't think we knew one way or another to tell you the truth.

Q.      But at that time, as you've testified here to, you did, in fact, form an opinion based upon what you heard?

A.      Yes, because that's all that was presented to us, right.

*     *     *

THE COURT:       Very well. I don't believe that Mrs. Hansen has expressed an unqualified opinion or belief as to the merits of the action. She indicated that she had an opinion at one point because she had no other evidence to go on.

It was rather haphazardly, I think, formed as people have a tendency to do when they read a news account.

She has told us in several different manners and response to different questions that she can be objective in hearing this case and will judge it on its merits exclusively from the evidence on the stand.

Is that correct, Mrs. Hansen?

JUROR HANSEN: That's correct.

///

///

25

1   Transcript of Voir Dire Examination of Jurors, Respondents' Exh. 27 at 8-17.[3]

2           Both jurors stated directly, and without reservation, that they could set aside the

3   opinions they formed based on media reports of the crime, and act as impartial jurors.

4   Both jurors stated that they understood the presumption of innocence and the State's

5   burden of proving Snow's guilt beyond a reasonable doubt.

6           This Court recognizes that defense counsel elicited statements from Jurors Van

7   Compernolle and Hansen that contradicted, somewhat, their statements that they could

8   be impartial and that they understood the presumption of innocence and the State's

9   burden of proof. *See* Transcript of Voir Dire Examination of Jurors, Respondents' Exh.

10  26 at 32-33 (Juror Van Compernolle), Exh. 27 at 26 (Juror Hansen). However, in light of

11  the entirety of the voir dire of these two jurors, and granting appropriate deference to the

12  state trial court's appraisal of the two jurors, this Court cannot say that it was objectively

13  unreasonable for the state courts to conclude that Jurors Van Compernolle and Hansen

14  understood the presumption of innocence and the State's burden of proof, and could act

15  as impartial jurors. *See Skilling*, 561 U.S. at 386-87; *Mu'Min*, 500 U.S. at 427.

16          As with Claim 3, Snow requests an evidentiary hearing with regard to Claim 4.

17  *See* Motion for Evidentiary Hearing at 3. However, here again, Snow does not state

18  what factual issue he would address at an evidentiary hearing with respect to alleged

19  bias on the part of Jurors Van Compernolle and Hansen, and he does not give any

20  indication what evidence he would seek to introduce in that regard. Snow argues that, in

21  state court, he "could not develop facts relevant to the pretrial publicity surrounding his

22  trial, the extent of the community's hostility against him, or the presence of media in the

23  courtroom," and he suggests he should be able to present such evidence in this case.

24  *Id.* at 7-8. Such evidence, however, would have no bearing on the issue of the

25  impartiality of these two particular jurors. An evidentiary hearing is unwarranted; it is

26

27          [3]With respect to Respondents' Exh. 27, the page numbers cited are the CM/ECF
    pagination, as the original page numbering on the transcript pages is not visible in the
28  exhibit provided by respondents.

plain from the record that the state courts' ruling with respect to the impartiality of Jurors Van Compernolle and Hansen was objectively reasonable.

The Nevada Supreme Court's denial of the claim asserted by Snow as Claim 4 of his second amended habeas petition in this case was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and the state court's ruling was not based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). Snow does not show habeas corpus relief to be warranted. The Court will deny habeas corpus relief with respect to Claim 4.

## C.    Claim 10D

In Claim 10D, Snow claims that his trial counsel was ineffective "for failing to offer alternative grounds for the admission of the testimony of Mr. Hardaway and Mr. Springfield, and for failing to offer their testimony at the penalty phase." Second Amended Petition at 108. Snow claims:

> 29.    Mr. Houston [Snow's trial counsel] attempted to impeach the co-conspirator hearsay statements of the Parkers with testimony from Terry Hardaway and David Springfield that they had been incarcerated with the Parkers, and had heard the Parkers say that they did not know Mr. Snow, and further, that the police had charged the wrong person. *See* 4/6/84 TT at 782-85, 805-10. . . .

> 30.    Mr. Houston was ineffective for failing to argue that the statements were admissible under Nev. Rev. Stat. § 51.069 as impeachment evidence. That statute provides in pertinent part that "when a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, or supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness." Competent counsel would have attempted to impeach the hearsay statements of the Parkers by introducing the testimony of Hardaway and Springfield under this rule of evidence. . . .

> 31.    Mr. Houston was ineffective for failing to introduce the testimony of Hardaway and Springfield under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038 (1973). Under *Chambers*, hearsay rules may not be applied "mechanistically to defeat the ends of justice" where the hearsay sought to be introduced is critical to the defense, because a defendant has a due process right to present a defense. 410 U.S. at 302, 93 S.Ct. at 1049. *Chambers* is substantially similar to Mr. Snow's case in that both are murder cases in which hearsay statements exculpating the defendant were excluded from trial under state evidence rules regarding declarations against interest.  Competent counsel would have recognized

the similarity in the cases and attempted to introduce the hearsay statements under the rule announced in *Chambers*. . . .

     32.   Mr. Houston was also ineffective for failing to introduce the testimony of Hardaway and Springfield at the penalty phase of Mr. Snow's trial. Under Nev. Rev. Stat. § 175.552, evidence may be presented which would not otherwise be admissible at the guilt phase, so concerns about hearsay do not prevent evidence such as the testimony of Hardaway and Springfield from being presented. . . .

Second Amended Petition at 109-10.[4]

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two prong test for analysis of claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state court has adjudicated a claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable, as required by AEDPA, is especially difficult. *See Richter*, 562 U.S. at 104-05. In *Richter*, the Supreme Court instructed:

///

_____

[4]The trial transcripts cited here by Snow in the form "TT" are found in the record in Respondents' Exhs. 1g and 1h.

1
2
3
4
5
6

> The standards created by *Strickland* and § 2254(d) are both highly deferential, [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

7    *Richter*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 994-95 (2010)

8    (acknowledging double deference required for state court adjudications of Strickland

9    claims).

10    In analyzing a claim of ineffective assistance of counsel under *Strickland*, a court

11    may first consider either the question of deficient performance or the question of

12    prejudice; if the petitioner fails to satisfy one prong, the court need not consider the

13    other. *See Strickland*, 466 U.S. at 697.

14    The Nevada Supreme Court ruled on this claim, as follows, on the appeal in

15    Snow's first state habeas action:

16
17
18
19
20
21

> Snow claims Houston was ineffective because he failed to get exculpatory hearsay statements made by coconspirators John and Doug Parker admitted into evidence. We disagree. Kathy Faltinowski and Sally Cook testified regarding statements made by the Parkers that Snow was the hired hit man. These statements were admitted as coconspirator declarations pursuant to NRS 51.035(3)(e). Houston unsuccessfully tried to introduce other hearsay statements made by the Parkers to jail inmates Terry Hardaway and David Springfield, that Snow was the wrong man. Houston offered the statements as declarations against interest, NRS 51.345. The statements were not allowed because the Parkers had pled guilty prior to making the statements.

22
23
24
25
26
27
28

> Snow argues that Houston was ineffective for not offering the statements as hearsay impeachment evidence pursuant to NRS 51.069(1). We note, however, that coconspirator declarations are not hearsay statements. NRS 51.035 provides: "'Hearsay' means a statement offered in evidence to prove the truth of the matter asserted unless . . . [t]he statement is offered against a party and is . . . [a] statement by a coconspirator of a party during the course and in furtherance of the conspiracy." NRS 51.035 is based on Federal Rule 801, which also states that coconspirator statements are not hearsay. Fed. R. Evid. 801(d)(2)(v). Therefore, since NRS 51.069 applies to impeachment of hearsay statements, it would not apply to non-hearsay statements under NRS 51.035. The Parkers' statements would not be admissible unless they fell

under a general hearsay exception. Therefore, Houston was not guilty of ineffective assistance of counsel by not offering the Parker's statements as hearsay impeachment.

Even assuming Snow's contention that Houston could have introduced the Parkers' statements at the penalty hearing, his failure to do so does not mean that he violated the *Strickland* standards. Houston stated that he did not try to introduce the evidence because he felt there was overwhelming evidence of Snow's guilt and if he presented the Parkers' statements to the jury after they had already found Snow guilty, the jury would turn off the real arguments that Houston wanted to present. Giving Houston the deference required by *Strickland*, we hold that his reasons for not trying to introduce the Parkers' statements at the penalty hearing should be considered acceptable trial strategy, not ineffective assistance.

\*   \*   \*

We also hold that Houston did not fall below the *Strickland* standard by failing to cite and argue various constitutional issues raised in *Chambers v. Mississippi*, 410 U.S. 284 (1973), *Green v. Georgia*, 442 U.S. 95 (1979) or *Dutton v. Evans*, 400 U.S. 74 (1970).

Order Dismissing Appeal, Respondents' Exh. 7 at 5-6 and 6-7 n.3.

This Court finds that the Nevada Supreme Court's ruling on this claim was not objectively unreasonable; in the Court's view, "'fairminded jurists could disagree' on the correctness of the state court's decision." *See Richter*, 562 U.S. at 101.

With respect to Snow's argument that his trial counsel was ineffective for not arguing that the hearsay statements of the Parkers were admissible under NRS § 51.069(1), through the proposed testimony of Hardaway and Springfield, the Nevada Supreme Court's ruling was a matter of state law and, to that extent, is authoritative. Snow's arguments in this regard in this federal habeas action — that his counsel performed unreasonably for not asserting NRS § 51.069(1) as a ground for admission of the testimony of Hardaway and Springfield, and that there was a reasonable probability of a different outcome at trial if he had — fail for that reason. Snow's trial counsel did not perform unreasonably for not asserting an argument based on state law found by the state supreme court to be without merit, and there is no reasonable probability of a different outcome at trial if he had.

///

30

1    Snow goes on to assert that the state courts' application of the hearsay rule to

2    bar the testimony of Hardaway and Springfield violated his federal constitutional right to

3    due process of law, under the Supreme Court case of *Chambers v. Mississippi*, 410

4    U.S. 284 (1973). The Nevada Supreme Court rejected that argument without

5    discussion. *See* Order Dismissing Appeal, Respondents' Exh. 7 at 6-7 n.3.

6    The Due Process Clause of the Fourteenth Amendment guarantees a criminal

7    defendant a meaningful opportunity to present a complete defense. *Chambers*, 410

8    U.S. at 294; *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986). That, however,

9    does not give a defendant license to present any evidence he pleases; "the accused, as

10   is required of the State, must comply with established rules of procedure and evidence

11   designed to assure both fairness and reliability in the ascertainment of guilt and

12   innocence." *Chambers*, 410 U.S. at 302; *see also United States v. Scheffer*, 523 U.S.

13   303, 308 (1998) ("A defendant's right to present relevant evidence is not unlimited, but

14   rather is subject to reasonable restrictions."); *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)

15   ("The accused does not have an unfettered right to offer testimony that is incompetent,

16   privileged, or otherwise inadmissible under standard rules of evidence."); *Moses v.*

17   *Payne*, 555 F.3d 742, 757 (9th Cir.2009) (defendant's right to present relevant evidence

18   is subject to reasonable restrictions, "such as evidentiary and procedural rules"). Rather,

19   the constitutional due process right identified in *Chambers* is violated only by evidence

20   rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or

21   'disproportionate to the purposes they are designed to serve.'" *Holmes v. South*

22   *Carolina*, 547 U.S. 319, 324 (2006) (quoting *Scheffer*, 523 U.S. at 308, and *Rock v.*

23   *Arkansas*, 483 U.S. 44, 58, 56 (1987)).

24   The Supreme Court has observed that "[o]nly rarely [has it] held that the right to

25   present a complete defense was violated by the exclusion of defense evidence under a

26   state rule of evidence." *Nevada v. Jackson*, ___ U.S.___, 133 S.Ct. 1990, 1992, 186

27   L.Ed.2d 62 (2013) (per curiam). The Ninth Circuit Court of Appeals has repeatedly ruled

28   that state courts have acted reasonably in excluding unreliable or insubstantial evidence

offered by defendants as exculpatory. *See Phillips v. Herndon*, 730 F.3d 773, 776-78 (9th Cir.2013); *Christian v. Frank*, 595 F.3d 1076, 1085-86 (9th Cir.2010); *Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir.1999).

In *Chambers*, , the Court held that Mississippi evidence rules barring a party from impeaching his own witness and not allowing a hearsay exception for statements against penal interest denied the defendant a fair trial in accordance with his federal constitutional right to due process of law. *See Chambers*, 410 U.S. at 302-03. The Court's narrow holding is limited to the facts in *Chambers*. The hearsay statements at issue in *Chambers* were third-party confessions; in holding that the exclusion of the third-party confessions from evidence was a due-process violation, the Court explained that "[t]he hearsay statements . . . were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300. The Court went on to discuss the factors that it considered with respect to the reliability of the statements: they were made "spontaneously to a close acquaintance shortly after the murder had occurred;" they were "corroborated by some other evidence in the case;" "each confession . . . was in a very real sense self-incriminatory and unquestionably against interest;" and "if there was any question about the truthfulness of the extrajudicial statements, [the person who made those statements] was present in the courtroom and was under oath." *Id.* at 300-01. The Court concluded: "The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest." *Id.* at 302.

The hearsay statements of the Parker brothers at issue in this case — the statements the Parkers allegedly made to Hardaway and Springfield, to the effect that they had never met Snow, and that Snow was not responsible for Harry Wham's murder — did not bear the "persuasive assurances of trustworthiness" that the Court found with respect to the hearsay in *Chambers*. Each of the factors identified by the Supreme Court in gauging the trustworthiness of the hearsay statements in *Chambers* weighs

against the trustworthiness of the Parkers' hearsay statements in this case.

In *Chambers*, the Supreme Court noted that the hearsay statements were made "spontaneously to a close acquaintance shortly after the murder had occurred." *See Chambers*, 410 U.S. at 300. In this case, the Parkers' statements to Hardaway and Springfield were allegedly made at least six months after the murder of Harry Wham, and, in fact, after the Parkers had pled guilty to charges related to the murder. *See* Transcript of Proceedings, April 9, 1984, Respondents' Exh. 1h at 830 (trial court finding that statements "could not have been made before July 27th [1983], when the Parkers entered pleas of guilty"). Hardaway and Springfield were not close acquaintances of the Parker brothers; they met the Parker brothers only when incarcerated with them at the Clark County jail. *See* Transcript of Proceedings, April 9, 1984, Respondents' Exh. 1g at 782 (Hardaway first met the Parker brothers in jail in September or October of 1983); *id.* at 805 (Springfield knew the Parkers because he met them in jail sometime after his arrest on May 31, 1983).

The Supreme Court also pointed out that the hearsay statements at issue in *Chambers* were "corroborated by some other evidence in the case." *See Chambers*, 410 U.S. at 300. In this case, on the other hand, the statements allegedly made by the Parker brothers that they did not know Snow would have been in stark contrast to overwhelming evidence indicating that the Parker brothers did know Snow, and in fact worked with him to further the conspiracy to murder Harry Wham. For example: Kathy Faltinowski testified at length regarding Snow's participation directly with the Parker brothers in the conspiracy (s*ee* Testimony of Kathy Faltinowski*,* Transcript of Proceedings, March 28, 1984, Respondents' Exh. 1b at 190-214); Sally Cook testified that she saw Doug Parker give John Parker a slip of paper with "John Snow," and "New Jersey," and either an address or a phone number, written on it (*see* Testimony of Sally Cook, Transcript of Proceedings, April 2, 1984, Respondents' Exh. 1d at 375-77); Sally Cook testified that John Parker told her "that when John Snow comes to do a job, if he messes up the first time, he comes back to do it right, to finish it" (*see id.* at 378); the

evidence showed that a "John Parker," as sender, wired $700 to a "John Snow," as receiver, on January 31, 1983 (*see* Testimony of James E. Frassato, Transcript of Proceedings, April 2, 1984, Respondents' Exh. 1d at 429-35); there was evidence that someone identifying himself as "Johnny" called the Parker brothers' mother on the telephone at her home and told her to have Doug Parker get in touch with him (*see* Testimony of Jeanne Michael, Transcript of Proceedings, April 3, 1984, Respondents' Exh. 1e at 465-68); there was evidence that, when Snow was arrested, he had, in his wallet a slip of paper with a telephone number associated with Doug Parker written on it (*see* Testimony of Robert M. Allen, Transcript of Proceedings, April 4, 1984, Respondents' Exh. 1f at 622-30). So, not only was there no corroborating evidence suggesting that Snow was a stranger to the Parker brothers, but the overwhelming evidence was that the Parker brothers knew Snow and conspired with him to kill Harry Wham.

In *Chambers*, the Supreme Court explained that, in that case, each of the hearsay statements at issue "was in a very real sense self-incriminatory and unquestionably against interest." *See Chambers*, 410 U.S. at 300-01. That is not the case here. In this case, because the Parker brothers had already pled guilty when they allegedly made the hearsay statements to Hardaway and Springfield, those statements were not against their penal interests. *See* Transcript of Proceedings, April 9, 1984, Respondents' Exh. 1h at 830.

Finally, the Supreme Court noted in *Chambers* that "if there was any question about the truthfulness of the extrajudicial statements, [the declarant] was present in the courtroom and was under oath." *See Chambers*, 410 U.S. at 301. In contrast, in this case, the Parker brothers refused to testify at Snow's trial, and were, therefore, unavailable for cross-examination. *See* Testimony of Joseph Houston at Evidentiary Hearing, Transcript of Proceedings, September 15, 1986, Petitioner's Exh. 29 at 88-96.

As every factor identified by the Supreme Court in *Chambers* as bearing on the trustworthiness of the hearsay statements weighs against the trustworthiness of the

Parkers brothers' hearsay statements in this case, this Court cannot say that the Nevada Supreme Court's ruling — that Snow did not receive constitutionally ineffective assistance of counsel on account of his trial counsel's failure to argue that *Chambers* compelled the admission, in the guilt-phase of his trial, of the testimony of Hardaway and Springfield — was objectively unreasonable.

Snow also asserts that his trial counsel was ineffective for not offering the testimony of Hardaway and Springfield in the penalty phase of his trial. In this regard, Snow points out that in the penalty phase of a capital murder trial, the defendant may present evidence that would not be admissible in the guilt phase of the trial. *See* Second Amended Petition at 110, citing NRS 175.552. With respect to this assertion, the Nevada Supreme Court held:

> Even assuming Snow's contention that Houston could have introduced the Parkers' statements at the penalty hearing, his failure to do so does not mean that he violated the *Strickland* standards. Houston stated that he did not try to introduce the evidence because he felt there was overwhelming evidence of Snow's guilt and if he presented the Parkers' statements to the jury after they had already found Snow guilty, the jury would turn off the real arguments that Houston wanted to present. Giving Houston the deference required by *Strickland*, we hold that his reasons for not trying to introduce the Parkers' statements at the penalty hearing should be considered acceptable trial strategy, not ineffective assistance.

Order Dismissing Appeal, Respondents' Exh. 7 at 6. The Court agrees with this ruling of the Nevada Supreme Court.

At the evidentiary hearing in Snow's first state habeas action, Snow's trial counsel testified as follows regarding this matter:

[BY PETITIONER'S COUNSEL]

> Q.     Why did you not attempt to reintroduce the testimony of Hardaway and Springfield in the penalty phase, relying upon the fact that the statute says it's admissible, regardless of whether or not it is ordinarily admissible?

> A.     There are probably a number of reasons, but one reason I can think of is that there was overwhelming evidence of Mr. Snow's guilt which was presented, overwhelming, at trial. They had fingerprints, they had eye witnesses, they had co-defendants, they had monies sent to him by Western Union which he picked up with his passport. They had his signatures. Overwhelming evidence.

1    For me to present that type of evidence to the jury, after they found
2    him guilty, in the face of that, would be like saying to them, look, you made
     a mistake. If you had known these two guys, who have exceptionally long
3    prison sentences, have no reason whatsoever to worry about perjured
     testimony, came in here and testified that you made a mistake.

4    I think it would be like throwing it in their face. It would be ridiculous
5    to them, and they would turn off my real arguments that I wanted to
     present.  That Mr. Snow was unfairly being singled out in the case. That
6    maybe the reason was he was black.

7    That I thought we had some good defense arguments, and if I
     stood up and presented evidence to them that they had made a mistake,
8    and he was really innocent, that they would resent that, and it would be
     worse for him then not -- then not presenting it.

9    So I think that's one of the reasons I didn't try to present it, is that I
10   don't think it would have been effective. I don't think it would have been
     believable, because I didn't believe them.

11   But that didn't mean I wouldn't put it on, if that's what -- they were
12   going to stick to their story, but I don't think it would have been effective.
13   It's like saying, look. You made a mistake.  He is really not guilty. He is an
     innocent man.

     And I don't think anyone would ever believe that, the jury, would
14   believe that, with the state of the evidence that was presented.

15                                    *    *    *

16   Q.    Is there any other way that you can conceive of presenting
17   Springfield and Hardaway's testimony to the jury in the penalty phase,
     other than saying you made a mistake?

18   A.    Well, whether I, no matter how I tried to color it, I think that's
19   what they would have thought. I was trying to say that they were idiots.
     They made a mistake.

20   And, look. If the judge hadn't kept this out, you would have known
21   this, and I'm sure you would have found him not guilty.

22   I just don't think it would have been effective.

23                                    *    *    *

24   Q.    All right. What I am getting at is, it was entirely possible, was
     it not, for you to present to the jury, not you're bozos, you made a mistake,
25   but anybody can make a mistake. And even if it's a one in 10,000 chance,
     you should err on the side of life?

26   A.    It's possible. But in this case, I didn't think that was a
27   reasonable argument.

28   Q.    Okay. Let's see if I understand correctly. You felt that you
     couldn't make that argument, because you felt they would be insulted, and

because it had something to do with their already having rejected your argument that he was not the murderer?

A.    No. I am just saying that when I argue a case, I argue what I think the jury is going to believe, and what's reasonable and what's practical, and what makes sense. Not what's theoretical. We don't have too many theoretical people on juries that I have had. So I didn't want to argue that.

I wanted to argue what was reasonable, because it was, on the surface, that they not even -- the State had not even asked for the death penalty on anyone else, but yet they were on him. That was reasonable, so they shouldn't give it to him.

No one else got the death penalty, except him, maybe. Those were the reasonable arguments that I wanted to make.

Testimony of Joseph Houston at Evidentiary Hearing, Transcript of Proceedings, September 15, 1986, Petitioner's Exh. 29 at 134-35, 136, 138-39.

In light of the unreliable nature of the Parker brothers' alleged statements that they did not know Snow, the conflict of those alleged statements with strong evidence to the contrary, and the jury's finding in the guilt phase of the trial, on overwhelming evidence, that Snow was guilty of murder, it was reasonable for the state courts to conclude that Snow's trial counsel made a sound strategic decision in not attempting, in the penalty phase, to raise residual doubt about Snow's guilt by means of the very questionable testimony of Hardaway and Springfield.

Snow requests an evidentiary hearing with regard to Claim 10D. *See* Motion for Evidentiary Hearing at 3. However, here again, Snow does not state specifically what factual issue he would address at an evidentiary hearing with respect to Claim 10D. The only evidence that Snow suggests he would offer at an evidentiary hearing, with respect to Claim 10D, appears to be testimony of Hardaway and Springfield. *See id.* at 8. However, Hardaway and Springfield testified, out of the presence of the jury, at Snow's trial. *See* Transcript of Proceedings, April 9, 1984, Respondents' Exh. 1g at 782-800 (testimony of Hardaway); *see id.* at 805-19 (testimony of Springfield). It is clear, therefore, how Hardaway and Springfiled would have testified if called as witnesses

///

1  before the jury. Snow does not explain why further testimony by them is necessary with
2  regard to Claim 10D. An evidentiary hearing is unwarranted.

3       The Nevada Supreme Court's denial of the claim in the remaining portion of
4  Claim 10D was not an unreasonable application of clearly established federal law, as
5  determined by the Supreme Court, and it was not based on an unreasonable
6  determination of the facts in light of the evidence presented in state court. *See* 28
7  U.S.C. § 2254(d). The Court will deny Snow habeas corpus relief with respect to the
8  remaining portion of Claim 10D.

9       **D.    The Remaining Portion of Claim 10K**

10      In Claim 10K, Snow claims that his trial counsel was ineffective "for failing to
11  investigate or present any mitigating evidence at Mr. Snow's capital sentencing
12  hearing." Second Amended Petition at 120. In the September 12, 2013, ruling on
13  respondents' motion to dismiss, the Court dismissed Claim 10K, except to the extent
14  Snow claims that his trial counsel was ineffective for failing to present evidence that
15  Snow had once saved the life of a prison guard, and evidence that in the past two
16  physicians had stated their opinion that Snow was legally insane. *See* Order entered
17  September 12, 2013 (dkt. no. 173) at 50-51, 55-58.[5]

18      With respect to these claims, the Nevada Supreme Court ruled as follows:

19          Snow contends that Houston was ineffective for failing to make a
20   reasonable investigation to prepare for a penalty hearing. *Strickland*, 466
     U.S. at 691 (1984). Houston testified that he spoke with Snow on
21   numerous occasions in an attempt to prepare for a possible penalty
     hearing. He asked Snow for the name of any person who could say one
22   good thing about him, or had witnessed any good deed he had done, but
     Snow refused to give any names or information about his background.
23   The failure to obtain possible mitigation evidence must be attributed to
     Snow's lack of cooperation, not to Houston's lack of diligence. *Cf. Collins
24   v. Francis*, 728 F.2d 1322, 1349 (11th Cir.), *cert. denied*, 469 U.S. 963

25      [5]Snow's argument in his reply exceeds the scope of the remaining portion of
    Claim 10K. *See* Order entered September 12, 2013 at 22-24, 50-51, 55-58. To the
26  extent it does so, Snow's argument in his reply is improper. Snow's suggestion that the
    Court should revisit its ruling that certain portions of Claim 10K are procedurally
27  defaulted is improperly asserted in his reply, and is untimely. The Court, however, will
    treat Snow's argument in this regard as a request for a certificate of appealability with
28  respect to this issue, and will grant the certificate. *See* Part V., below.

(1984) (counsel not ineffective for failing to investigate witnesses in mitigation when defendant failed to make their presence known to counsel); *Funchess v. Wainwright*, 772 F.2d 683, 689 (11th Cir.), *cert. denied*, 106 S.Ct. 1242 (1985) (trial counsel cannot be faulted for not investigating history of psychological problems when defendant never told him of past problems and nothing in a psychological examination indicated any problems). Consequently, we hold that Houston did not provide ineffective assistance at the penalty hearing.

Order Dismissing Appeal, Respondents' Exh. 7 at 7.

The Court finds that the Nevada Supreme Court was not objectively unreasonable in ruling that any failure to discover and present evidence that Snow had once saved the life of a prison guard, and evidence that in the past two physicians had stated their opinion that Snow was legally insane, was attributable to Snow's failure to cooperate with his trial counsel, not to unreasonable performance on trial counsel's part. In this Court's view, "'fairminded jurists could disagree' on the correctness of the state court's decision." *See Richter*, 562 U.S. at 101.

Furthermore, setting aside the question whether or not trial counsel's performance in this regard was unreasonable, and assuming for purposes of analysis that Snow's evidence would have been as he describes it, there is no reasonable probability that the evidence — evidence that Snow had once saved the life of a prison guard, and evidence that in the past two physicians had stated their opinion that Snow was legally insane — would have changed the outcome of the penalty phase of Snow's trial. In the context of Snow's trial, this proposed mitigation evidence would have had little impact. One of the aggravating circumstances found by the jury was that Snow murdered Harry Wham "for himself or another, for the purpose of receiving money or any other thing of monetary value." *See* Judgment of Conviction, Respondents' Exh. 2a at 1. Thus, the jury found that Snow acted as a hired killer. In the face of that aggravating circumstance especially, in this Court's view, it would have made little difference to the jury that Snow once did a good deed in prison, in acting to thwart a murder plot. And, with respect to the evidence that, in the past, two physicians had found Snow to be criminally insane, that evidence would have had little effect as well.

1  Snow testified at trial. The jury, therefore, had a much stronger and more immediate

2  impression regarding his mental state. In short, the Court finds that Snow was not

3  prejudiced by his trial counsel's alleged unreasonable failure to discover and offer this

4  rather meager mitigation evidence in the penalty phase of the trial.

5  Snow requests an evidentiary hearing with regard to Claim 10K. *See* Motion for

6  Evidentiary Hearing at 3. Snow argues that that "[t]he state court refused to admit or

7  consider exhibits proposed by Snow demonstrating that two doctors had found him

8  insane in one of the cases that was admitted against Snow in the penalty phase of his

9  trial as aggravating evidence, and that Snow thwarted a plot to murder a prison guard."

10 *See* Motion for Evidentiary Hearing at 8. However, in the analysis of this claim, the

11 Court assumes that Snow's evidence regarding these matters would be as he asserts;

12 therefore, there is no need for an evidentiary hearing.

13 The Nevada Supreme Court's denial of the claim in the remaining portion of

14 Claim 10K was not an unreasonable application of clearly established federal law, as

15 determined by the Supreme Court, and it was not based on an unreasonable

16 determination of the facts in light of the evidence presented in state court. See 28

17 U.S.C. § 2254(d). The Court will deny Snow habeas corpus relief with respect to the

18 remaining portion of Claim 10K.

19 **E.    The Remaining Portion of Claim 10N**

20 In Claim 10N, Snow claims that his trial counsel was ineffective "for failing to

21 investigate and raise Claims Three through Nine, Twelve through Fifteen, Nineteen and

22 Twenty." Second Amended Petition at 130. In the September 12, 2013, ruling on

23 respondents' motion to dismiss, the Court dismissed Claim 10N, except to the extent

24 Snow claims that his trial counsel was ineffective for failing to raise the claim in Claim 8

25 that the prosecutor improperly injected his own opinion into his closing argument in the

26 penalty phase of the trial. *See* Order entered September 12, 2013 at 22-24, 50-51, 55-

27 58.

28 ///

1    The remaining part of Claim 10N, therefore, is narrow. The claim in Claim 8 that

2    Snow asserts, in Claim 10N, that his trial counsel was ineffective for failing to raise, is

3    as follows:

4        3.    The prosecutors also committed misconduct during the
         penalty phase closing arguments. Mr. Harmon repeatedly tried to align the
5        jury with the prosecution by referring to the jury as "we" throughout his
         closing argument. 4/17/84 TT at 1230, 1233, 1241. Mr. Harmon often
6        coupled his use of the term "we" with an improper injection of his personal
         opinions. 4/17/84 TT at 1230. For example, Mr. Harmon told the jury very
7        early in his closing argument that:

8            In some ways, I'm very partial about this case, about this
             type of crime. I believe in a society which is governed by the
9            rule of law.

10           I don't think it's proper if a wife can't get along with her
             husband and if she covets her husband's business, that she
11           resort to murder.

12           In fact personally I am sure we share this. I despise murder
             and I despise those who murder. And, yet, on the other hand
13           I have a real commitment to human dignity and I reverence
             life.
14
         4/17/84 TT at 1230. Mr. Harmon's attempts to align the jury with the
15       prosecution, and injection of his personal beliefs was improper.

16           4.    Mr. Harmon improperly gave his personal opinion that Mr.
         Snow deserved the death penalty, while his white co-defendant did not.
17       Mr. Harmon stated that "I want to make it very clear from the beginning,
         this is a statement, a position I take in front of you and before everyone
18       and it is not an impulsive decision. But the state does seek the imposition
         of the death penalty in this case." 4/17/84 TT at 1231. Mr. Harmon then
19       stated his personal opinion that Mr. Snow was more culpable than Peggy
         Wham, telling the jury that "I suppose my answer to the philosophical
20       debate is we can debate a long time but the person who actually stares
         another human being in the face and killed him and shot him down like a
21       dog is the most culpable." 4/17/84 TT at 1235. Mr. Harmon continued
         giving his personal opinion, telling the jury, "I suppose you could find
22       because he is obviously intelligent and articulate that is sufficient to
         mitigate murder. I say it isn't and I say based on this evidence, there is no
23       mitigation and so that brings us back to whether there are aggravating
         circumstances." 4/17/84 TT at 1236. It was highly improper for Mr.
24       Harmon to give the jury his personal opinion regarding Mr. Snow's
         punishment. Mr. Snow alleges that trial and direct appeal counsel were
25       ineffective for failing to raise this issue. Mr. Snow further alleges that there
         is a reasonable probability of a more favorable result at trial and on direct
26       appeal if counsel had raised this issue.

27                          *    *    *

28

41

6.      Mr. Harmon impermissibly argued that the jury should use its verdict to send a message to the community and to "other would be contract killers," while at the same time trying to align the jury with the prosecution by using the term "we." 4/17/84 TT at 1241. Mr. Houston objected to the term "we" as well as to the reference to "sending a message to the community." 4/17/84 TT at 1241. The court admonished the prosecutor that the term "we" might be misunderstood by [the] jury. 4/17/84 TT at 1242. Mr. Harmon resumed his argument, immediately asking the jury to consider the impact of its verdict on would-be contract killers. 4/17/84 TT at 1242. Mr. Houston again objected, but the trial court overruled the objection, holding instead that the remarks were not appropriate. Prosecutors are not permitted to ask the jury to send a message to the community, and the trial court erred in overruling Mr. Houston's objection.

7.      Mr. Harmon attempted to inflame the passions of the jurors by analogizing Mr. Wham's death to a Percy Shelley poem. Mr. Harmon stated that:

The life of 63-year-old Harry Wham was shattered by four bullets deliberately sent crashing into his face. Like Shelley's shattered lamp, his light was suddenly, violently extinguished. Didn't simply flicker and dim and go out. Somebody in this courtroom put it out. I say let the light go out of John Snow in the Nevada execution chamber.

4/17/84 TT at 1244. This comment stating the prosecutor's personal opinion could only have been intended to inflame the passions of the jury, and was improper argument. Mr. Snow alleges that trial and direct appeal counsel were ineffective for failing to raise this issue. Mr. Snow further alleges that there is a reasonable probability of a more favorable result at trial and on direct appeal if counsel had raised this issue.

Second Amended Petition at 86-88.[6,7]

On Snow's appeal in his first state habeas action, the Nevada Supreme Court rejected this claim, discussing certain aspects of it as follows:

Snow's contention that Houston was ineffective at the penalty hearing because he failed to challenge the prosecutor's personal opinion that Snow deserved the death penalty is without merit. Snow's brief in the direct appeal, written by Houston, contains nearly 20 references where the prosecutor, Mel Harmon, referred to the jury as "you" and himself as "I" or "we" during the penalty hearing. Snow repeats most of these references in his habeas brief. The mere fact that Snow's present counsel seeks to

---

[6]The trial transcripts cited here by Snow in the form "TT" are found in the record in Respondents' Exh. 1k.

[7]With respect to Snow's claim that his appellate counsel was ineffective for failing to raise these claims of prosecutorial misconduct on Snow's direct appeal, see the discussion regarding the remaining portion of Claim 16, Part IV.H., below.

present the issue differently, or include similar references not challenged on appeal, does not prove that Houston fell below permissible standards of representation.

* * *

Snow's contention that Houston was ineffective for failing to object to the prosecutor's quote from Shelley, "When the lamp is shattered, the light and the dust lie dead," and later exhortation, "I say let the light go out of John Snow in the Nevada execution chamber," is also without merit. *See Dawson v. State*, 103 Nev. ___, 734 P.2d 221 (1987).

Examining the cumulative effect of the asserted prosecutorial errors, we hold the habeas court did not err in finding that Houston was not ineffective for failing to object to every allegedly improper statement made by the prosecutor.

Order Dismissing Appeal, Respondents' Exh. 7 at 3-4.

To the extent that the Nevada Supreme Court ruled that any further objection by trial counsel to the comments of the prosecutor on state-law grounds would have been of no avail, that court's ruling is authoritative, and is not subject to question in this federal habeas corpus action.

With respect to the limits placed on prosecutorial argument by the federal constitution, a prosecutor's improper remarks render a conviction unconstitutional only if they so infect the trial with unfairness as to make the resulting conviction a denial of due process. *Parker v. Matthews*, ___ U.S. ___, 132 S. Ct. 2148, 2153, 183 L. Ed. 2d 32 (2012) (per curiam); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Comer v. Schriro*, 480 F.3d 960, 988 (9th Cir. 2007). The ultimate question is whether the alleged misconduct rendered the petitioner's trial fundamentally unfair. *Darden*, 477 U.S. at 183. In determining whether a prosecutor's argument rendered a trial fundamentally unfair, a court must judge the remarks in the context of the entire proceeding to determine whether the argument influenced the jury's decision. *Boyde v. California*, 494 U.S. 370, 385 (1990); *Darden*, 477 U.S. at 179-82. In considering the effect of improper prosecutorial argument, the court considers whether the trial court instructed the jury that its decision is to be based solely upon the evidence, whether the trial court instructed that counsel's remarks are not evidence, whether the defense

43

objected, whether the comments were "invited" by the defense, and whether there was overwhelming evidence of guilt. *See Darden*, 477 U.S. at 182. The *Darden* standard is general, leaving courts leeway in reaching outcomes in case-by-case determinations. *Parker*, 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

This Court agrees with the Nevada Supreme Court that Snow's trial attorney did not render ineffective assistance of counsel, in violation of Snow's federal constitutional rights, in the manner in which he handled, at the penalty phase of the trial, the allegedly improper arguments of the prosecutor.

The following, in their broader context, are the arguments of the prosecutor that are the subject of this claim:[8]

I agree with the Philosopher Gerda. He said in one quotation which is referred to very often, "I can promise you to be sincere but not impartial."

In some ways, I'm very partial about this case, about this type of crime.  I believe in a society which is governed by the rule of law.

I don't think it's proper if a wife can't get along with her husband and if she covets her husband's business, that she resort to murder.

In fact, personally I am sure we share this.  I despise murder and I despise those who murder. And, yet, on the other hand I have a real commitment to human dignity and I reverence life.

However, if our system of criminal justice means anything, it means that the punishment should fit the crime. Mr. Houston has alluded to this already. I won't disappoint him.

Whether you share my views, it is ultimately going to be up to you. But I want to make it very clear from the beginning, this is a statement, a position I take in front of you and before everyone and it is not an impulsive decision. But the State does seek the imposition of the death penalty in this case.

---

[8]As with Claim 10K, Snow's argument in his reply exceeds the scope of the remaining portion of Claim 10N. *See* Order entered September 12, 2013 at 22-24, 50-51, 55-58. To the extent it does so, Snow's argument in his reply is improper. Snow's suggestion that the Court should revisit its rulings that certain portions of Claim 10N are barred by the statute of limitations, and that certain portions of Claim 10N are procedurally defaulted, is improperly asserted in his reply, and is untimely. However, as with Claim 10K, the Court will treat Snow's argument in this regard as a request for a certificate of appealability with respect to these issues, and will grant the certificate. *See* Part V., below.

1                              *   *   *

2          Number four, the defendant was an accomplice in a murder
   committed by another person, and his participation the murder was
3  relatively minor.

4          Well, if we were here trying Kathy Faltinowski, perhaps that would
   apply. She was an accomplice but she didn't murder anybody. And if we
5  were here prosecuting John Parker, that applies. He was involved but he
   didn't kill anyone. And the same is true of Douglas Parker.
6
          Now, I start in that order because the way I view the case, that's the
7  relative culpability of people. You start with Kathy, you go to John who
   sent the money order and who was involved with her in bringing the killer
8  to the scene.

9          Then you go to the widow's boyfriend, her lover, Douglas Parker,
   and then you come to the lady who conceived the plan. And then I
10 suppose we really get into a philosophical argument.

11         Who is more culpable, the person who plans to murder or the
   person who actually physically pulled the trigger? How often have you
12 thought about the mentality of the killer?

13         Someone who will go into the garage of another man's residence
   with a loaded gun and wait to kill. It is a little hard for me to conceptualize.
14
          I can't get a grasp on that kind of mentality. The man who would
15 wait there and then when another human being drives in, without
   provocation, this is a person John Snow didn't know, he just jumps out of
16 his hiding place and fires bullets into the man's head.

17         What type of person would do that? Well, I suppose my answer to
   the philosophical debate is we can debate a long time but the person who
18 actually stares another human being in the face and killed him and shot
   him down like a dog is the most culpable.
19
                               *   *   *
20
          Number seven, any other mitigating circumstances. Well that is
21 pretty broad. I suppose that can mean if he went to college it is a
   mitigating circumstance.
22
          I suppose you could find because he is obviously intelligent and
23 articulate that is sufficient to mitigate murder.

24         I say it isn't and I say based on this evidence, there is no mitigation
   and so that brings us back to whether there are aggravating
25 circumstances.

26                             *   *   *

27         We try to decide what punishment fits the crime and then we try to
   decide if what we do here today, if the message we send out to this
28 community and to other would be contract killers —

                                45

1        MR. HOUSTON:   Your Honor, I object to the argument in this
2  regards. This jury is here to decide this case. They aren't here to be
   sending any message on behalf of "we."

3        When Mr. Harmon's identifying himself with this jury and if they are
   part of the State to send some message out, that is clearly improper
4  argument, trying to place the jury with him, on his side of the case to send
   out some community message.
5
6        They are here as part of the community to decide this case and to
   decide the relevant issues in the case, not to become some crusading part
7  of the community. It is just not proper argument.

8        MR. HARMON [prosecutor]: I think a factor they should consider is
   deterrents, if for no other.

9        MR. HOUSTON:   I didn't object to that when he wanted to say
10 deterrents. To include them in the way he has done —

11       MR. HARMON:   That is what I am arguing, Your Honor. How do
   you deter?

12       THE COURT:   I think the word "we" might be misunderstood.
   It is obvious that the jury would act and their decision would be on their
13 own and not part of the prosecution's or defense's.

14       MR. HARMON:   Thank you. Ladies and gentlemen, we can
   think — excuse me, I will strike we. I submit that when deterrent is viewed,
15 it is viewed, number one, with what the impact of the decision will have on
   others who might contemplate contract killings. And, number two —
16
17       MR. HOUSTON:   Your Honor, I am going —

18       MR. HARMON:   The effect on the defendant —

19       MR. HOUSTON:   I am going to object to this argument and ask
   the jury be instructed —

20       MR. HARMON:   I wish he would wait for his turn.

21       MR. HOUSTON:   I would be glad to wait for my turn.

22       MR. HARMON:   If you give me five minutes more, I can sit
   down.
23
24       MR. HOUSTON:   May my objection be heard? My objection is
   that that the jury's here to decide this case under these facts and not to
25 decide the cases of possible murders that may occur in the future and not
   to align themselves or to make any —

26       This case should not be used and shouldn't be argued this case
   somehow is going to have an effect on all possible future cases that might
27 occur, and I think that is improper argument.

28 ///

1    THE COURT:    It is a philosophical argument.  It is not totally
2    new to the Court. I believe under the circumstances that the closing
     remarks of counsel are not inappropriate. I will allow it. Proceed.

3                                    *    *    *

4    MR. HARMON:    When the ultimate punishment is imposed, that
5    means for sure in the case of the killer, it would mean in the case of John
     Snow, that he would never handle, he would never cock and he would
6    never pull the trigger and fire bullets into the body of another victim.

7    He would never stalk, never threaten, never gun down another
     Harry Wham.

8    Percy Shelley, the poet, in a poem entitled When the Lamp is
9    Shattered, states as follows:

10   "When the lamp is shattered, the light and the dust lies dead."

11   The life of 63-year-old Harry Wham was shattered by four bullets
     deliberately sent crashing into his face. Like Shelley's shattered lamp, his
12   light was suddenly, violently extinguished.

13   Didn't simply flicker and dim and go out. Somebody in this
     courtroom put it out. I say let the light go out of John Snow in the Nevada
14   execution chamber.

15   It has been said that a bullet once sent abroad flies irrevocably and
     today I say the punishment you impose should be as irrevocable, as final
16   and as deadly as the bullets of John Snow.

17   Transcript of Proceedings, April 17, 1984, Respondents' Exh. 1k at 1230-31, 1234-35,

18   1236, 1241-43, 1243-44.

19        The prosecutor spoke in the first person, and arguably did so in a manner that

20   improperly expressed his personal opinions. Snow's trial counsel did object, and the trial

21   court indicated that the prosecutor's use of the pronoun "we" was improper,

22   undermining, somewhat, any added force of the arguments attributable to that usage.

23   To the extent that Snow's trial counsel arguably should have further objected, in this

24   Court's view, given the nature of the prosecutor's arguments, Snow was not prejudiced.

25   The prosecutor's comments did not include vouching for the veracity of a witness's

26   testimony, and did not include any suggestion that the prosecutor had extra-record

27   knowledge of the case. The same arguments could easily have been conveyed in a

28   proper manner — not cast as opinions of the prosecutor. The prosecutor's expressions

of personal opinion were not so egregious as to render Snow's trial unfair. There is no reasonable probability that the outcome of Snow's trial would have been different had his trial counsel further objected to the prosecutor's arguments.

The Nevada Supreme Court's denial of the claim in the remaining portion of Claim 10N was not an unreasonable application of clearly established federal law, as determined by the Supreme Court, and it was not based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d). The Court will deny Snow habeas corpus relief with respect to the remaining portion of Claim 10N.

### F.    Claim 11

In Claim 11, Snow claims that his constitutional rights were violated "because of the trial court's failure to properly instruct the jury concerning the weight to be given accomplice testimony." Second Amended Petition at 131. Snow alleges that he proposed, but the trial court refused to give, the following instruction:

> It is the law that the testimony of an accomplice ought to be viewed with caution. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case.

Second Amended Petition at 132; *see also* Petitioner's Exh. 76.[9]

In its order regarding respondents' motion to dismiss, the Court ruled that Snow raised this claim in his second state habeas action, and it was held procedurally barred in state court under a state-law rule that was inadequate to support application of the federal procedural default doctrine. *See* Order entered September 12, 2013 (dkt. no. 173) at 51-52. As the claim was procedurally barred in state court, the Nevada Supreme Court did not rule on the claim on its merits. When a state court does not reach the merits of a habeas claim, "federal habeas review is not subject to the deferential

---

[9]The trial court did instruct the jury that accomplice testimony had to be corroborated by other evidence tending to connect the defendant to the commission of the offense. *See* Second Amended Petition at 131; *see also* Petitioner's Exh. 74.

1   standard that applies under AEDPA to 'any claim that was adjudicated on the merits in

2   State court proceedings.'" *Cone v. Bell*, 556 U.S. 449, 472 (2009) (quoting 28 U.S.C. §

3   2254(d)). Rather, the federal habeas court reviews the claim *de novo. Id.*; *Scott v. Ryan*,

4   686 F.3d 1130, 1133 (9th Cir.2012); *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 & n.4

5   (9th Cir.2002). Therefore, this Court's review of Claim 11 is *de novo*.

6        Federal habeas corpus relief is not available for alleged errors of state law.

7   *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Snow has cited no authority holding that,

8   when accomplice testimony is used in a state criminal prosecution, a cautionary

9   instruction about the reliability of such testimony is required as a matter of federal

10  constitutional law.

11       There is no federal constitutional requirement requiring a cautionary instruction

12  about the reliability of accomplice testimony. *See United States v. Fritts*, 505 F.2d 168,

13  169 (9th Cir.1974) ("Finally, Fritts claims reversal is in order because the trial court

14  failed to give, on its own motion, a cautionary instruction on accomplice testimony. We

15  have already rejected the contention."); *United States v. Augenblick*, 393 U.S. 348, 352

16  (1969) ("When we look at the requirements of procedural due process, the use of

17  accomplice testimony is not catalogued with constitutional restrictions."); *Laboa v.*

18  *Calderdon*, 224 F.3d 972, 979 (9th Cir.2000).

19       Snow asserts, alternatively, that "state law unequivocally compelled the trial court

20  to instruct the jury that the 'statements of an accomplice should be received with great

21  caution,'" and, under *Hicks v. Oklahoma*, 447 U.S. 343 (1980), he "has a liberty interest

22  in the application of state law under federal due process principles." Reply at 52,

23  quoting *State v. Streeter*, 20 Nev. 403, 403, 22 P. 758, 759 (1889).

24       For the proposition that Nevada law unequivocally requires a cautionary jury

25  instruction regarding accomplice testimony, Snow cites *Streeter, supra*; *Buckley v.*

26  *State*, 95 Nev. 602, 604, 600 P.2d 227, 228 (1979); and *State v. Jukich*, 49 Nev. 217,

27  217, 242 P. 590, 598 (1926). However, under more recent Nevada law, a cautionary

28  instruction regarding accomplice testimony is not required where — as in this case —

1   the testimony of the accomplice is corroborated by other evidence. *See Howard v.*
2   *State*, 102 Nev. 572, 576-77, 729 P.2d 1341, 1344 (1986). This Court disagrees that
3   Nevada law unequivocally requires a cautionary jury instruction regarding accomplice
4   testimony.

5       The Supreme Court has held that state laws guaranteeing a defendant
6   procedural rights may create liberty interests protected by the Due Process Clause. *See*
7   *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460-63 (1989); *Hicks*, 447
8   U.S. at 346; *Bonin v. Calderon*, 59 F.3d 815, 841 (9th Cir.1995). "'A State creates a
9   protected liberty interest by placing substantive limitations on official discretion.'"
10  *Thompson*, 490 U.S. at 462 (citation omitted); *see also Lambright v. Stewart*, 167 F.3d
11  477, 487 (9th Cir.1999) (to create a federally-protected liberty interest, a state law "must
12  contain 'substantive predicates' that circumscribe official decisionmaking") (citation
13  omitted). In addition, there must be "explicitly mandatory language" in the law relating to
14  the liberty interest in question, and the law "must provide more than merely procedure; it
15  must protect some substantive end." *Bonin*, 59 F.3d at 842 (internal quotations omitted).
16  To give rise to a constitutionally protected liberty interest, the state procedural right must
17  be "unqualified." *Clemons v. Mississippi*, 494 U.S. 738, 747 (1990). The Court
18  concludes that Snow did not have a constitutionally protected liberty interest in the trial
19  court giving a cautionary jury instruction regarding accomplice testimony.

20      The Court will deny habeas corpus relief with respect to Claim 11.

21      **G.    Claim 14**

22      In Claim 14, Snow claims that his constitutional rights were violated "due to the
23  jury's finding of death eligibility based upon the burglary aggravating circumstance,
24  which was predicated solely upon an intent to commit murder when entering a building."
25  Second Amended Petition at 141. Snow asserts that the burglary aggravating
26  circumstance does not adequately narrow the class of persons eligible for the death
27  penalty, as required under the Supreme Court's holdings in *Godfrey v. Georgia*, 446
28  ///

1    U.S. 420 (1980), and *Lowenfeld v. Phelps*, 484 U.S. 231 (1988). *See* Second Amended

2    Petition at 141-43; Reply at 53-57.

3            The Nevada Supreme Court ruled on this claim, as follows, on the appeal in

4    Snow's first state habeas action:

5            Snow also contends that charging NRS 200.033(4) [murder
         committed during the commission or attempt to commit a burglary] as an
6         aggravating circumstance does not adequately circumscribe the class of
         death-eligible persons. Snow relies on *Collins v. Lockhart*, 754 F.2d 258
7         (8th Cir.1985), which held that where the defendant commits murder
         during a robbery, use of the aggravating circumstance of "murder
8         committed for pecuniary gain" violates the Eighth Amendment. *Collins*
         noted that since every robber-murderer has acted for pecuniary gain, a
9         jury which found robbery-murder could not rationally avoid also finding the
         aggravating circumstance of "murder committed for pecuniary gain." In
10        effect, the robber-murderer entered the sentencing phase with a built-in
         aggravating circumstance, making it possible that the death penalty could
11        be imposed without narrowing the eligible class of persons committing that
         type of crime. *Id.* at 264. Snow contends that *Collins* applies to his case
12        because the double use of an intent to murder (for both the contract
         murder and the underlying crime of the burglary) violates the Eighth
13        Amendment in that it does not adequately narrow the class of persons
         eligible for the death penalty. We disagree.

14
15            Snow was found guilty of premeditated murder, not felony murder
         as in *Collins*. Since NRS 200.033(4) does not apply to every premeditated
16        murder, it properly serves a narrowing function. Moreover, we note that
         *Collins* has been expressly rejected by other jurisdictions. *See Wingo v.*
17        *Blackburn*, 783 F.2d 1046 (5th Cir.1986). Even if we found this to be a
         "double counting" issue, we would adopt the rationale in *Wingo*, allowing a
18        state to "authorize capital punishment for persons guilty of these
         aggravated acts where the jury does not find that mitigating circumstances
         justify less than the death penalty." *Id.* at 1051.
19

20    Order Dismissing Appeal, Respondents' Exh. 7 at 9-10.

21            This Court finds this claim to be meritless. The burglary aggravating

22    circumstance does plainly narrow the class of persons eligible for the death penalty —

23    applying only to persons who commit first degree murder after entering a building for

24    that purpose or for the purpose of committing another felony.

25            The Nevada Supreme Court's ruling on this claim was not an objectively

26    reasonable application of *Godfrey* or *Lowenfield*. *See* 28 U.S.C. § 2254(d). The Court

27    will deny Snow habeas corpus relief with respect to Claim 14.

28    ///

51

Case 2:03-cv-00292-MMD-CWH   Document 201   Filed 09/25/15   Page 52 of 55

**H.     The Remaining Portion of Claim 16**

In Claim 16, Snow claims that his constitutional rights were violated "because Mr. Snow was not afforded effective assistance of counsel on appeal." Second Amended Petition at 146. Snow claims that his constitutional rights were violated by the failure of his appellate counsel to raise, on appeal, in whole or in part, Claims 3, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 19, and 20. *Id.* at 146-47. In the September 12, 2013, ruling on respondents' motion to dismiss, the Court dismissed Claim 16, except to the extent Snow claims that his appellate counsel was ineffective on his direct appeal for failing to raise Claim 3, and for failing to raise the claim in Claim 8 that the prosecutor improperly injected his own opinion into his closing argument in the penalty phase of the trial. *See* Order entered September 12, 2013 at 27-29, 45-48, 55-58. Claim 3 is Snow's claim, discussed above, that his federal constitutional rights were violated "because his death sentence is disproportionate to that of his co-defendants, being the product of racial discrimination by state officials." Second Amended Petition at 45.

The Nevada Supreme Court denied this claim, as follows:

> Snow contends that the habeas court erred in finding that Joseph Houston [Snow's trial counsel] was not ineffective for failing to argue on direct appeal that Snow's death sentence was disproportionate to the sentences given to the other members of the conspiracy. We disagree. At that time, NRS 177.055(2) required this court to review whether the sentence was proportionate to penalties imposed in other cases. We concluded that the sentence of death was not disproportionate and that it had not been imposed under passion, prejudice, or any arbitrary factor. *Snow*, 101 Nev. at 448-49. The habeas court correctly held that we were aware of the sentences received by the co-defendants when we conducted our proportionality review. Snow's sentence was not disproportionate to the other defendants. Although the other conspirators were equally culpable, Snow was the hired trigger man, with a lengthy criminal and prison record. None of the other defendants had similar criminal records. We have upheld disparate death sentences in other cases. *See Neuschafer v. State*, 101 Nev. 331, 337, 705 P.2d 609, 613 (1985) (death sentence not disproportionate to other defendants who received life with or life without parole). Therefore, we hold that Houston did not render ineffective assistance for failing to raise the issue on appeal.
>
> Snow raises several claims of error that Houston was ineffective during the penalty phase of the trial because he did not object to improper statements made by the State and did not address the issues on appeal. The habeas court held that Houston had made a tactical decision as to

52

which issues he would raise on appeal. We agree. The State correctly observes that Snow is trying to relitigate substantive issues that should have been raised on appeal. See NRS 34.810(1)(b). Nevertheless, we address each claim of error.

Snow's contention that Houston was ineffective at the penalty hearing because he failed to challenge the prosecutor's personal opinion that Snow deserved the death penalty is without merit. Snow's brief in the direct appeal, written by Houston, contains nearly 20 references where the prosecutor, Mel Harmon, referred to the jury as "you" and himself as "I" or "we" during the penalty hearing.  Snow repeats most of these references in his habeas brief. The mere fact that Snow's present counsel seeks to present the issue differently, or include similar references not challenged on appeal, does not prove that Houston fell below permissible standards of representation.

\* \* \*

Snow's contention that Houston was ineffective for failing to object to the prosecutor's quote from Shelley, "When the lamp is shattered, the light and the dust lie dead," and later exhortation, "I say let the light go out of John Snow in the Nevada execution chamber," is also without merit. *See Dawson v. State*, 103 Nev. ___, 734 P.2d 221 (1987).

Examining the cumulative effect of the asserted prosecutorial errors, we hold the habeas court did not err in finding that Houston was not ineffective for failing to object to every allegedly improper statement made by the prosecutor.

Order Dismissing Appeal, Respondents' Exh. 7 at 2-3.

The Nevada Supreme Court's denial of this claim was not objectively unreasonable. *See* Discussion of Claim 3, *supra*; Discussion of Remaining Portion of Claim 10N, *supra*. The Court will deny habeas corpus relief with respect to the remaining portion of Claim 16.

I.      **Claim 19**

Claim 19 is Snow's cumulative error claim. Snow claims that his constitutional rights were violated "due to the cumulative errors in the admission of evidence and instructions, gross misconduct by state officials and witnesses, and the systematic deprivation of [Mr. Snow's] right to the effective assistance of counsel." Second Amended Petition at 160.

With respect to Claims 3, 4, 10D, 11 and 14, the Court's rulings do not involve any issue regarding whether or not Snow was prejudiced by any alleged error.

53

Therefore, these claims do not come into play in the context of Snow's cumulative error claim.

With respect to Claims 10K, 10N and 16, the Court has considered the question of the cumulative effect of the attorney error alleged in those claims. The Court finds that, whether taken individually or cumulatively, there is no reasonable probability that the attorney errors alleged in Claims 10K, 10N and 16 had any impact on the outcome of Snow's trial or appeal.

The Court will deny Snow habeas corpus relief on Claim 19.

## V.   CERTIFICATE OF APPEALABILITY

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir.2000).

Applying the standard articulated in *Slack*, the Court finds that a certificate of appealability is warranted with respect to the following issues:

(1) whether this Court erred in denying habeas corpus relief with respect to Claim 4;

(2) whether this Court erred in denying habeas corpus relief with respect to Claim 10D;

(3) whether this Court erred in ruling the following claims barred by the statute of limitations: 1A, 1D, 2, 5, 6, 10B, 10F, 10G, 10H, 10I, 10J, 10L (to the extent it concerns the jury instruction regarding premeditation and

54

the lack of a jury instruction regarding the requirement that aggravating circumstances be found unanimously by the jury), 10M (to the extent it concerns the lack of a jury instruction regarding the requirement that aggravating circumstances be found unanimously by the jury), 10N (to the extent it is based on trial counsel's failure to raise Claims 5, 6, 12A, 13B, 13C, 19, and 20), 12A, 13B, 13C, 16 (to the extent it is based on appellate counsel's failure to raise Claims 5, 6, 12A, 13B, 13C, 19, and 20), 17, 18, 20, and 21; and

(4) whether this Court erred in ruling the following claims barred by the procedural default doctrine: 1A, 1B, 1C, 1D, 1E, 2, 5, 6, 7, 8, 9, 10A, 10C, 10E, 10F, 10G, 10H, 10I, 10J, 10K (except to the extent Snow claims that his trial counsel was ineffective for failing to present evidence that Snow had once saved the life of a prison guard, and evidence that in the past two physicians had stated their opinion that Snow was legally insane), 10L, 10M, 10N (except to the extent that Snow claims that his trial counsel was ineffective for failing to raise the claim in Claim 8 that the prosecutor improperly injected his own opinion into his closing argument in the penalty phase of the trial), 12A, 12B, 13A, 13B, 13C, 15, 16 (except to the extent that Snow claims that his appellate counsel was ineffective on his direct appeal for failing to raise Claims 3 and 5, and the claim in Claim 8 that the prosecutor improperly injected his own opinion into his closing argument in the penalty phase of the trial), 17, 18, and 21.

## VI.    CONCLUSION

It is therefore ordered that the petitioner's motion for evidentiary hearing (dkt. no. 187) is denied.

It is further ordered that the petitioner's second amended petition for writ of habeas corpus (dkt. no. 137) is denied.

It is further ordered that the petitioner is granted a certificate of appealability as described above.

It is further ordered that the Clerk of the Court shall enter judgment accordingly.

DATED THIS 25th day of September 2015.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE